**UNITED STATES of America, Appellee,**

**v.**

**Thomas J. CIAMBRONE, Jr., Appellant.**

**No. 255, Docket 84–1249.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 21, 1985.

Decided April 4, 1986.

Simon H. Rifkind (Robert S. Smith and Eric S. Goldstein, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, of counsel), for appellant.

Anne C. Ryan, Asst. U.S. Atty. (Rudolph W. Giuliani, U.S. Atty. for S.D.N.Y., and Warren Neil Eggleston, Asst. U.S. Atty., of counsel), for appellee.

Before OAKES, NEWMAN and KEARSE, Circuit Judges.

OAKES, Circuit Judge:

Thomas Ciambrone appeals from a conviction in the United States District Court for the Southern District of New York, Robert L. Carter, Judge, for one count of conspiracy to commit extortion and three counts of attempted extortion in violation of the Hobbs Act, 18 U.S.C. § 1951 (1982). Ciambrone was sentenced to a term of imprisonment of ten years on each of the counts on which he was convicted, the sentences to run concurrently, and to pay a fine of $4,000 on each count. We affirm.

There is no question that there was a conspiracy to commit extortion and that numerous overt acts were committed in furtherance of that conspiracy. Thus, the major question before us is whether there was sufficient evidence of appellant Ciambrone's participation in the conspiracy. Additional questions are raised as to the admission of co-conspirator statements against him, the district court's instruction on conscious avoidance, the possibility that a juror's remarks that the defendants "were on the fringe of the Mafioso" or "part of the mob" tainted the jury deliberations, and whether appellant should have been tried with his obviously guilty younger brother, Jerry Chambrone, and with Joseph Vincent Riggio, Jr., who among other things sought to blow up the car of one of the victims and did manage to burn down another victim's house and business office with Molotov cocktails. Jerry Chambrone was convicted and did not appeal. Riggio pled guilty and testified for the Government.

## BACKGROUND

The goal of the extortion scheme was to regain for T.J. Associates ("T.J."), a company owned and operated by Thomas Ciambrone and his brother Jerry, certain delivery business of Computer Sciences Company ("CSC"), a nationwide computer services company. CSC had transferred that business from T.J. to Apple Messenger Service ("Apple"), a company operated by Donald Miller. Appellant Thomas Ciambrone was president of T.J., and though he lived in Florida during the time period covered by the indictment—May 1982 through January 1984—was in regular contact with the T.J. office in White Plains, New York, and responsible for major business and operations decisions. Jerry Chambrone was the on-the-spot manager of T.J. and responsible for the day-to-day operations of the business.

CSC provided accounting and payroll services to a number of businesses, and using its data base, it would print out payroll checks that were delivered to clients in

various geographical areas. For some time prior to November 1982, T.J. made CSC deliveries to Zone 48, which is in Westchester, Putnam, and Dutchess Counties in the state of New York. After Brinson Weeks, a CSC employee, was transferred from corporate headquarters in California to the White Plains office, however, he hired Apple to replace T.J., and on November 15, 1982, Apple began servicing the Zone.

About the time that T.J. lost the Zone 48 business to Apple, Jerry Chambrone spoke about it to Joseph Riggio, a childhood friend of Jerry and of his brother Thomas. Chambrone told Riggio that Apple president Miller had "infiltrated a trucking route which was under contract by T.J. and had made no attempt to come and try and talk to us ab[o]ut it." Chambrone asked Riggio to talk to Miller and "make the man understand what he was doing wasn't right."

As a result, Riggio went to Miller's home in West Milford, New Jersey, on November 20, 1982. Riggio urged Miller to stop doing business with CSC. Although Riggio denied it, Miller testified that during this conversation Riggio threatened to burn down his house and blow up his car. Riggio himself admitted at trial that he had compared the payroll delivery business to the garbage business, suggesting that truckers have "area rights" and that "the only way to survive" is to have "respect for each other's work." Miller also testified that Riggio "said he was sent by Tom Ciambrone." Riggio told Miller, as they both testified, that the [Ch/Ci]ambrones had "obligations in New York City" and that "[t]here are certain friends that take a personal interest in their business dealings and financial obligations." Miller told Riggio he wanted to speak to Thomas Ciambrone, and Riggio agreed to arrange a meeting.

Riggio then relayed his conversation with Miller to Jerry Chambrone and warned Jerry that Thomas Ciambrone's conversation with Miller should be "strictly business" since Miller might be tape recording the conversation. Jerry Cham-

brone said he would relay Riggio's description of the conversation with Miller to Thomas and told Riggio that his brother would take an 11:30 flight from Florida to New York the following day, November 21, 1982. Riggio relayed this information to Miller, who agreed to meet with Thomas Ciambrone on November 22, 1982.

Thomas Ciambrone caught his 11:30 flight and made several attempts to reach Miller during the day and evening of the 22nd. The Apple president, however, spent the day with the New Jersey State Police, and Ciambrone's initial efforts to contact him at work were thus unsuccessful. At 9:30 p.m., after making numerous phone calls and after going to the Apple office and banging on the door, Thomas Ciambrone finally reached Miller by telephone at home and they agreed to meet the following day.

Miller wore a microphone and transmitter during his meeting with Ciambrone so that the conversation that took place was recorded by the New Jersey State Police. A transcript and tape recording of that conversation were in evidence at trial with only a few details of the conversation in dispute. This court has listened to the tape recording. The conversation is important to the case and therefore will be recounted here at some length.

After some preliminary amenities, Miller asks Ciambrone, "So what do you have to talk to me about?" Ciambrone responds, "I just thought there was a couple things you should know so, the rest of it is up, up to you." According to the Government's version of the tape, Thomas Ciambrone then says, "We have a contract with them. I want you to realize that, ya know. And uh, are you facing me because I am on tape recorder or . . .?" According to the appellant's version, he says, "We have a contract with them. I want you to realize that, ya know. And uh, are you facing that way because I'm not tape record—[unintelligible]." We think the Government's version makes more sense and, having listened to the tape, are convinced that in any event Thomas Ciambrone, following up on

Riggio's suggestion to Jerry Chambrone, was—almost in a laughing manner—checking out whether he was being tape recorded. Miller replies, "No. You want me to sit this way?" Appellant says, "I don't care." He then begins to talk about his contract with CSC and T.J.'s eighteen years of work for the computer company. Partly unintelligible conversation takes place in the course of which Thomas Ciambrone says that "we're goin[g] to court," and then he says that

all the other messenger services, heavy, heavy messenger services, uh, armored trucks, (unintelligible) they haven't bothered to touch it because they know the situation and I guess you didn't know so I just figured I let you know because what it will end up being is we're going to court. You'll probably be named in it which will be very stupid. You'd have to be.

After discussing the litigation, Ciambrone adds, "I just figured when the drivers, for some reason have been pissed, and said they were gonna take things in their own hands and all the rest of that shit, I said that's stupid. Right!" This last comment could clearly be taken as a hint at violence on the part of T.J.'s drivers.

After some more discussion, Ciambrone informs Miller,

I felt personally, okay, I can't speak for other people but since I'm the owner of the company uh, I think you should just.... You're turning open a big can of worms here. They're using ya. And I know you want the business. They're holdin[g] back. Show you letters, payment that they owe us for some work that we've done.

Miller tells Ciambrone that CSC asked him to apply for the business, that he gave the company a price on Zone 48, and that CSC accepted his offer.

The conversation then turns to a subject of critical importance in determining whether Ciambrone was involved in the conspiracy. With obvious reference to Riggio's comments of two days before, Miller says, "Alright now I'm being threatened.

Where, where do I come down there. Where do I stand?" Ciambrone abjures, "Not by me you're not [being threatened]." Miller responds, "Well, Joe Riggio came here and said he was sent by you. Said he...." Ciambrone interrupts,

No sir, not by me. I don't, I don't threaten anybody. I never threatened anybody in my life. Ever. Like I said, and I say this very seriously. The drivers have gotten really, they grew up with everybody here and some of the people that work for you grew up with them. Okay. Uh, I don't deal in business that way, I never have."

Parenthetically, it may be noted that the reference to the drivers is presumably to Ciambrone's earlier comment that they were "pissed off."

Ciambrone continues,

The one thing that I have, and I've had all my life, including right here ... is a reputation. I have my word, my bond *and* if anything, all the customer relationships that we have with regards to the areas. First of all, they're with, they're with the unions, which I'm not. Understand that, I never have been.

Miller presses Ciambrone by asking, "Is Joe Riggio with the union?" Ciambrone replies, "They ... everybody's with the unions. I'm not with the unions."

Miller asks Ciambrone, "Does he [Riggio] work for you?" According to the Government's version, the T.J. president replies, "Joe Riggio never worked for me at all." According to Ciambrone's version, he replies, "Joe Riggio don't work for me at all." We are inclined to take the latter version since Miller's next question—"Did he ever work for you?"—makes sense only as a follow-up to Ciambrone's version of his statement. In any case, Ciambrone answers the question, "Uh, ten years ago, five or eight years ago, nine years ago. Worked for the same company. They got rid of him." Miller next asks Thomas Ciambrone, "They did or you did [fire Riggio]?" Ciambrone says, "They didn't want him. See, part of the contract reads they have the right. If they don't like some-

body, they don't give a shit who he is, they have the right to release him."

Thomas Ciambrone tries to change the subject. He says, "If you have a driver that could be the best in your business and they don't like him, they have the right to do that. Now...." But Miller leads him back to the threat. "[O]ne thing that I don't particularly like Tom, is the fact that when I was approached on this, it was through a threat. My driver was threatened, I was personally threatened that my house would be blown up or burned down." Ciambrone asserts, "Well, I, I have no idea about that." Miller persists, "He came as a direct messenger from you...." "No sir," Ciambrone interrupts. Miller then pointedly comments, "And after I spoke to him I said I'd like to talk to you and the next day you're flying up here to talk to me." Miller's observation implies that Riggio's and Ciambrone's activities were closely connected and that Ciambrone had knowledge of Riggio's behavior since Ciambrone had traveled from Florida to New Jersey in response to a request made by Miller to Riggio. Ciambrone fails to rebut the implication. He confusedly says, "I was flying up here to ... no, I was gonna see you anyway. I had a meeting, uh with CSC. We were in a meeting right now for four hours." He again changes the subject, "They're ready.... Because of the last letters that we sent which is gonna uh, the next letter which will be sent I guess legally which will incorporate the constitution of our services and it will incorporate you so uh, I mean we know where the service comes from." He follows this with, "I don't do things like that [threaten people]. Uh, that can be only verified by uh, 500 people in this town. Some of them don't like me, jealous or whatever, okay, I don't do things that way. Never have, don't intend to, don't want to." There is not a word spoken in outrage at Riggio's threats, much less a statement that Ciambrone will try to stop Riggio from making or carrying out such threats. Ciambrone merely tries to distance himself from Riggio's actions.

What people may want to do and say is their prerogative, okay, they and the company, which pays us for this service, okay, we pay unions to stay out of our hair. Since the company has cut back and not paid me my dollars and my monies and everything else that's involved, okay. The unions have the prerogative to do whatever the hell they want. I don't pay them. I paid them for 15 years. Leave me alone, what do you want, policemen's ball or whatever the hell they call it.

Ciambrone is obviously alluding to the fact that he has had to pay off the unions to keep them from creating problems for his company and he implies that Riggio is a union person. He then discusses CSC: "[T]hey're hurtin[g] because they put somebody in the job [Brinson Weeks] that didn't know what the hell's goin[g] on and they don't have the right to go and do what they're doin[g]. I come to speak to you because I was comin[g] to speak to you anyway," suggesting that he did not come because Riggio asked that he do so. Ciambrone continues,

> I came to speak to you because the drivers thought that I should speak to the people that are involved and tell [']em, explain to [']em that hey, we do have a contract, ah what they're doing is creating a hurt on the people that should be working. All you're doing is taking work off somebody that was working....

This statement alludes back to the drivers being angry. He then goes on to say,

> The only point of issue is that the service that we have, and the only service that we have is the whole total effort.... If you like you can call the lawyer, you can go see the contract yourself. You can read it and make your own decision. I just think that it's gonna get to be a real stupid, ridiculous nonsense of a lawsuit....

He says that CSC owes T.J. over half a million dollars and that "[w]hen it comes to damages and claims, we're gonna have to include all the people that have created us

damages and claims. You're gonna be one of them, that's what the lawyer told us." He says, "You could do business with [CSC]. All their business is supposed to come to us."

Miller suggests that it would be "stupid" for Apple to stop working for CSC. Thomas Ciambrone replies, "No, I'll tell ya, at this stage of the game I don't think that uh, uh, anything you want to do is stupid, you have [to] go to work and do what you gotta do." After asserting that T.J. won its contract with CSC through competitive bidding, he refers again to the "big lawsuit." And Ciambrone says, "I was told not even to bother to come [to see Miller]. I said, well, I live in town. I do know the guy. And I did know you. Well, let me go talk to him." Then he refers back to the threats:

> As far as people coming up to talk to you or do things, I have no idea. Don't wanna know about it, I don't care to know about it. And you can tell [']em—anybody. It has nothing to do with.... Don't ever let them use my name. I don't use people. I use myself as an individual. I do it by the law. I've done it that way. Good, bad or indifferent, if it comes out that's what God meant it to be. If it comes out good, then I'm right. If it comes out bad, then I'm stupid. I've been there before ... many years ago, uh, it came out bad but it ended up coming out good because uh, a year down the road uh, it was a reversed decision.... Hey listen, there are a lot of people out there that prostitute, I don't believe that you should do that in your business.

Ciambrone continues,

> I don't think that you come from the areas where people would just do it [whatever "it" is] to be spiteful. They're using whatever method they can to try to bring my company to its knees.... Uh, for your own knowledge, let them show you a contract, if they will.

He then stresses that T.J.'s contract is an "exclusive" one.

Miller says that he is going to stay in business with CSC but asks Ciambrone to give him a copy of the contract so that he can evaluate the situation. Ciambrone replies, "[W]hy don't you ask them for the contract. See if they'll allow you to read the contract?" Miller says that CSC will not allow him to do so. Ciambrone says, "I'd show you, but I would like you to ask them first. There's a reason for this. The story of Moses uh, and the pharaohs." The story that Ciambrone relates is that of two women who

> come with a baby and one says we'll split it in half and the other one says no give the baby whole. The pharaoh knows which one is the mother because the mother wants the baby in one piece. Just see what they'll say. What else can I tell you.

Ciambrone says if CSC refuses to allow Miller to examine the contract, "[t]hat's gonna tell ya somethin[g]. I'll still let you read mine. I'll tell my lawyer, you know." Miller asks him if he has a copy of the contract and Ciambrone says, "I don't have it here."

After some further conversation, Ciambrone returns to a topic previously discussed.

> It's your prerogative. The rest is up to you. I just figured it's gonna be shit. You know, its gonna be, excuse the expression, it is gonna be uh, a big uh hullabaloo. It's gonna be uh, uh litigation, it's gonna be arbitration, part of the contract, and part of the court you're in now.... [W]e'll have to subpoena whoever the hell, is gonna be involved in this thing.

After a brief interchange, Ciambrone delivers a long monologue and urges Miller to "feel them out first," "[s]ee who's on the right side or the wrong side of the coin," "get a hold of the contract." He continues: "I came which, for all practical purposes I shouldn't even have bothered. I mean, I'm being up front with ya. What happens only comes out in the wash. And uh, if it uh, if it comes down, it may be very bad for me for being here." He does not explain

what "it comes down" means or why his meeting with Miller could "be very bad" for him. Ciambrone tells Miller,

I'm being very up front with you. [']Cause they could say [whoever "they" are] well I came to see you and whatever else is involved. I came to just explain to you exactly what they're doing, okay. Whether you do or don't do business with them is none of my God damn business, okay.... If it's fair, competition is the greatest thing in the world.

He alludes to his pride in his years of service and continues,

I don't care in the least, I really don't. It's just that when somebody prostitutes what they're doing, and I use that word in the fashion that it's meant. Uh, that, that bothers me, they're not being sincere and up front about what they're doing and I think that you should at least, at least have the privilege to know what they're doing.

He continues,

I don't know what the hell is gonna come about. Uh, where it's gonna go from that point. It may go 100 percent in your favor. You know, I don't know what's gonna happen when you go to the court. You know uh, Sacco and V[a]nzetti, if you remember that case. Two of the most innocent guys in the world and ... they nearly put [']em to death.

Miller informs Ciambrone that until he sees a contract he will continue to do business with CSC. Ciambrone says, "Fine," and Miller reminds him that "right now, I have nothing to read." Ciambrone reassures him that he will give him a copy of the contract if he is allowed to, "if it's legal or whatever." When Miller subsequently refers to Ciambrone as "Joe," confusing him with Riggio perhaps, Ciambrone takes umbrage: "Tom.... Please don't call me that."

Ciambrone again asks him to ask CSC for the contract and adds a rather odd allusion,

Okay, you ask them. That's all. You know, who gives blood and who won't.

If I come up and say here's my arm take the blood, the other guy says I will but he doesn't ... who's your friend? You know what I'm trying to say? I'm not saying I'm their friend, I'm just explaining what's going on.... You know? But, uh and I don't send anybody knocking on your door. Ever. Before I do that. I have four children, I have a home, I believe very strongly in God, I don't believe in that shit. Excuse the expression. I believe in talking to people like you're supposed to talk.

"Okay," says Miller, and Ciambrone says, "Thank you very much for the time." Miller says, "Take care."

On November 24, 1982, the day after the meeting between Miller and Ciambrone, Brinson Weeks of CSC was followed by three men in a truck after pulling out of the CSC lot, but he was able to evade them, return to CSC, and secure an escort home. On December 21, 1982, when Scott Kunzelman, the Apple driver then assigned to Zone 48, arrived at work Jerry Chambrone told him to "watch yourself" and as he drove away Kunzelman was then followed by a car with "T.J. Trucking" written on the side. He, too, eluded his pursuer. During this same period Jerry Chambrone told a CSC employee, Norman Harrison, "that he was aware of where Scott [Kunzelman] socialized when he was not working, and that if he didn't stop ... if they didn't give him back Zone 48, that he was going to cut his balls off." All defendants were convicted on the substantive count that this threat involved.

Six months later, on June 1, 1983, Brinson Weeks's car was set on fire as it sat in a numbered space in a lot outside of his apartment complex in Greenwich, Connecticut, at an early hour of the morning. Jerry Chambrone told two men at CSC in a recorded conversation that whoever firebombed Weeks's car "only warned him," and added that "If I do it ... I'll make sure that fucker is in it. He deserves to be in it." At the trial, Riggio testified that in a conversation with Jerry Chambrone during the summer of 1983 "[i]t was said that Mr.

Weeks had a problem" and that Jerry was "in a good mood" in discussing Weeks's house being blown up and his summer home catching fire in Colorado.

In early September 1983, when Miller made no further attempt to contact T.J. Trucking and CSC continued to have Apple do the delivery work, Chambrone asked Riggio to burn one of the Apple driver's cars. Riggio twice drove to CSC with a Molotov cocktail ready to light and throw, but each time he arrived after the cars had left for the day. After the second of these occasions Chambrone indicated to Riggio that Miller "should be taught a lesson" and they later discussed blowing up Miller's house. Riggio testified that he warned Chambrone that "they are going to come down like a ton of bricks on us.... All of us, probably your brother, you, me." Chambrone said he wanted the house to be blown up and, according to Riggio's testimony, "made a gesture with his hand going down towards the ground as he said that." The price for the job was to be $4,000. On October 5, 1983, Riggio, accompanied by a friend, Frank Romano, went to the Miller home and one hurled a Molotov cocktail in the front of the house and the other threw one at the window of Apple's office, which adjoined the house. Both buildings caught fire.

The police arrested Riggio during the early morning hours of October 6, 1983. Later that morning a brief collect telephone call was placed from the T.J. office in White Plains to Thomas Ciambrone in Florida.

Chambrone paid Riggio $4,000 in cash for the firebombing and Riggio gave his partner Romano half of that. In addition, Riggio subsequently received $20,200 from Jerry Chambrone. The firebombings of the Miller home and the Apple office were the subjects of Counts Five and Six of the indictment; Ciambrone was found guilty of attempted extortion on both counts.

About a month after the firebombings, Jerry Chambrone blocked the path of Apple driver Linda Daly in the CSC lot and followed her back and forth as she loaded her car, telling her in an angry voice, "I want you to tell Don Miller that I'll never forgive him for as long as I live, and I'll remember him for a long time to come." The threat was the subject of Count Seven in the indictment; Jerry Chambrone was convicted on that count, but Thomas Ciambrone was found not guilty.

## DISCUSSION

It is clear that there was a conspiracy to commit extortion. There was overwhelming evidence that Jerry Chambrone and Riggio were participants in such a conspiracy and there were repeated incidents of threats as well as violence in seeking to force Apple and CSC to abandon their business relationship. The question is, of course, whether there was sufficient evidence to link Thomas Ciambrone to that conspiracy. In answering that question, we are required, in view of the jury verdict, to consider the evidence in its totality and make all permissible inferences in the light most favorable to the Government. *United States v. Orozco-Prada*, 732 F.2d 1076, 1081 (2d Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 154, 83 L.Ed.2d 92 (1984); *United States v. Carson*, 702 F.2d 351, 361–62 (2d Cir.), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2456, 2457, 77 L.Ed.2d 1335 (1983). Moreover, as this court has recently held, "[o]nce a conspiracy is shown to exist, the 'evidence sufficient to link another defendant to it need not be overwhelming.'" *United States v. Provenzano*, 615 F.2d 37, 45 (2d Cir.), *cert. denied*, 446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 (1980) (quoting *United States v. Head*, 546 F.2d 6, 9–10 (2d Cir.1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977)); *United States v. Paone*, 782 F.2d 386, 390 (2d Cir.1986). It is necessary only that there be "evidence of such substantiality as to justify a reasonably minded jury in believing beyond a reasonable doubt that the defendant was, in fact, connected with the conspiracy." *United States v. Malatesta*, 583 F.2d 748, 762 (5th Cir.1978) (Coleman, J., concurring), *aff'd en banc*, 590 F.2d

1379 (5th Cir.), *cert. denied,* 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979). *But cf. United States v. Tyler,* 758 F.2d 66 (2d Cir.1985) (conspiracy conviction reversed on sufficiency grounds where no evidence of an agreement between the only two alleged participants).

■ On balance, we find there was sufficient evidence to support Thomas Ciambrone's conviction. Ciambrone was intimately involved with T.J.'s operations. He was president of T.J. and stood to lose or gain as much as anyone depending on the outcome of the conspiracy. He made major decisions and, although he lived in Florida, he talked with his brother, the day-to-day manager of the company, as often as three times daily. Ciambrone also clearly participated in the nonextortionate part of the campaign to win back the business that Apple had taken: he met with Brinson Weeks on three occasions to discuss arbitration or settlement of the Zone 48 problem. Of course, these facts and incidents alone would not have permitted the jury to infer that Ciambrone and his brother consulted about the extortion scheme and the hiring of Riggio. But combined with the Miller-Ciambrone conversation, its context, and both prior and subsequent events, they adequately supported Ciambrone's conviction.

■ According to Miller's testimony, at the meeting at which Riggio threatened the Apple president, Riggio informed Miller prior to the threat that he had been "sent by Tom Ciambrone and that he [presumably Ciambrone] had friends and obligations in New York City and that those friends were also his [presumably Riggio's] friends." The question eliciting this testimony was objected to on unspecified grounds, presumably hearsay. But the admission of the statement was still proper under *United States v. Geaney,* 417 F.2d 1116 (2d Cir.1969), *cert. denied,* 397 U.S.

1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). There we held that if the trial court judge is properly satisfied that a fair preponderance of nonhearsay evidence indicates that the defendant participated in the conspiracy, a statement made during the course of and in aid of the conspiracy is admissible under the coconspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E). Thus, Riggio's comment was admissible under this exception.[1] As Judge Carter correctly found, a fair preponderance of the nonhearsay evidence, i.e., Ciambrone's control of T.J., the circumstances and context of his meeting with Miller, and the statements he made at that meeting, indicated that Ciambrone was a member of the conspiracy.

In response to Riggio's threats, Miller asked to meet with Thomas Ciambrone. The rapidity with which that request was satisfied bolsters the conclusion that Ciambrone was involved in the conspiracy. The jury was certainly entitled to infer that Jerry Chambrone relayed to Ciambrone Miller's request of Riggio to see Tom; in accordance with the schedule established by Riggio and Miller, Ciambrone flew from Miami to New York the following day, as Riggio informed Miller Ciambrone would. The latter's repeated calls and banging on the Apple office door, coupled with his lame excuses about having been in the area to meet with CSC, reinforce the conclusion that Riggio had indirectly conveyed to Ciambrone that it was urgent that he meet promptly with Miller. Moreover, the jury was surely entitled to infer from Thomas Ciambrone's question of Miller at the very beginning of their conversation that Riggio's caution that Miller might be wired had also been relayed to Ciambrone. Ciambrone's reaction to Miller's assertion that Riggio had threatened him is especially significant. He was apparently not surprised

---

**1.** Ciambrone objects, not just to Riggio's statement that he was sent by Ciambrone, but to the admission of a whole series of coconspirator statements on the grounds that they were inadmissible hearsay. Ciambrone's argument with respect to each of these statements is that there

is insufficient evidence linking Ciambrone to the conspiracy and that the requirements of *Geaney* were thus not satisfied. Since we find there was adequate evidence under *Geaney,* Ciambrone's objections fail in each instance.

by what Miller told him. We also note that Ciambrone never got angry or attempted to suggest that a threat to blow up or burn down Miller's house was outrageous, illegal, should be investigated, or the like. There is not a shred of evidence through cross-examination of Riggio or otherwise that, having been informed of these threats by Miller, Thomas Ciambrone even made further inquiry about the threats, let alone did anything to prevent them from being carried out.

Riggio's comment to Miller that he was "sent" by Ciambrone, the way in which the Miller-Ciambrone meeting was set up, Ciambrone's reaction to Miller's statements about Riggio, and the nature and extent of Ciambrone's ties with T.J. in general and Riggio in particular taken together warrant the inference that Ciambrone knew of the conspiracy. This inference is supported by the fact that the conversation with Miller shows a consciousness of guilt. Surely Ciambrone's question relative to his being tape recorded conveys the suggestion that perhaps he will not go as far as he would like to because he believes he might be tape recorded, which in turn would convey to Miller more apprehension than he might otherwise feel. Ciambrone's statement that "if it comes down, it may be very bad for me for being here.... [']Cause they could say well I came to see you and whatever else is involved," implies, at least as one inference, that the "they" he refers to there is not just CSC, though only a sentence later his use of "they" does refer to CSC. Ciambrone also attempted to distance himself from Riggio in a way that suggests consciousness of guilt. He stated that Joe Riggio had not worked for him for years, though the jury could fairly infer that he must have known from his brother Jerry that Riggio had indeed set up the meeting with Miller two days before. In apparent reference to Riggio's threats, Ciambrone says, "Don't wanna know about it, I don't care to know about it."

The jury could also validly find that the conversation with Miller was an act in furtherance of the extortionate scheme. Admittedly, the conversation contains re-

peated disavowals by Ciambrone that he himself would do business through threats, and the menacing interpretations urged by the Government are too tenuous to accept. At the same time, Ciambrone's reference to other messenger services, especially those in armored cars, as not bothering to touch CSC "because they know the situation" as well as the reference to T.J. drivers being "pissed off" and ready to take things into their own hands left to Miller's imagination just what Riggio's relationship to the T.J. drivers was, if any, and certainly did nothing to allay Miller's fears. As Judge Carter said in ruling on Ciambrone's motion for a judgment of acquittal prior to submission to the jury pursuant to Federal Rules of Criminal Procedure 29(c): "Viewing this conversation ... as a whole, the implication is that Mr. Thomas Ciambrone is warning Mr. Miller that although he is not at fault and he may be innocent, there will be serious trouble for him unless he gets out of his association with Computer Sciences." And when the references to potential violence are seen in light of the visit Riggio had paid a couple of days before, the jury could readily infer that Ciambrone knowingly aided the conspiracy by attempting to convey to Miller that violence was an appropriate response if Miller refused to back down.

*United States v. Cianchetti*, 315 F.2d 584, 587 (2d Cir.1963), does not help Ciambrone. There, the evidence showed that defendant "abstain[ed]" from criminal activity. Here, all that is necessary for proof of guilt is that an overt act or act were performed by one or more of the conspirators, coupled with evidence that Ciambrone joined in the unlawful agreement. *See United States v. Piampiano*, 271 F.2d 273, 275 (2d Cir.1959). It is true that Ciambrone in portions of the conversation denied threatening Miller and portrayed himself as a man who acts in accordance with law. Nevertheless, the conversation sufficiently related to violence so that, when coupled with Ciambrone's inquiry as to whether the conversation was being tape recorded, it was proper for the jury to treat

the conversation as if Ciambrone was simply trying to protect himself while nevertheless lending weight to the conspiratorial scheme. In sum, there was an adequate basis for the conviction on Count One, the conspiracy count.

Ciambrone's guilt of the crimes charged in Counts Four, Five, and Six involving the threat to the bodily parts of the driver Scott Kunzelman, the firebombing of Miller's house, and the firebombing of the Apple office was properly founded on correctly charged alternative theories. The first is based on *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), by virtue of which a member of a conspiracy may be held criminally liable for substantive offenses committed by his co-conspirators in furtherance of the conspiracy when those crimes were a "reasonably foresee[able]" consequence of the agreement. *Id.* at 647–48, 66 S.Ct. at 1184–85. Proof that a defendant knew of the conspiracy's essential nature is sufficient. *See United States v. Provenzano*, 615 F.2d 37, 44 (2d Cir.), *cert. denied*, 446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 (1980). Given Ciambrone's participation in the conspiracy, the threat made to Harrison about Kunzelman as well as the firebombings themselves were reasonably foreseeable within the meaning of *Pinkerton*, 328 U.S. at 646–48, 66 S.Ct. at 1183–85. *See also United States v. Cirillo*, 468 F.2d 1233, 1239 (2d Cir.1972), *cert. denied*, 410 U.S. 989, 93 S.Ct. 1501, 36 L.Ed.2d 188 (1973). Ciambrone's convictions on the substantive counts of attempted extortion were also proper under the alternative aiding and abetting theory, which was also charged to the jury. By virtue of Ciambrone's meeting with Miller, Ciambrone lent weight and authority to the prior and subsequent threatening conduct and action by Jerry Chambrone and Riggio, especially by referring to the steps and possible retaliation that the T.J. drivers might take if Miller kept the CSC contract. It was immaterial that Ciambrone was not proven to be specifically aware of the particular means used to carry out the criminal activity, *see United States v. Beck*, 615 F.2d 441, 448–52 (7th Cir.1980); *United States v. Austin*, 585 F.2d 1271, 1277 (5th Cir.1978); *United States v. Erb*, 543 F.2d 438, 445–46 (2d Cir.), *cert. denied*, 429 U.S. 981, 97 S.Ct. 493, 50 L.Ed.2d 590 (1976), or to have "participated in every phase of the criminal venture." *United States v. Diecidue*, 603 F.2d 535, 557 (5th Cir.1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980).

Ciambrone argues that the district court's instruction to the jury on conscious avoidance lacked any basis in evidence and suggested that the Government was not required to establish that he was a willful participant in the conspiracy. The instruction given is set forth in the margin.[2] It was given, however, in connection with the substantive counts of attempted extortion rather than in connection with the conspiracy count. As we held in *United States v. Mankani*, 738 F.2d 538, 547 & n. 1 (2d

---

2. In determining whether the defendant you are considering acted knowingly and wilfully, you may consider whether that defendant deliberately closed his eyes to what otherwise would have been obvious to him, and that is a consideration of some importance in this case, particularly with regard to Thomas Ciambrone's contentions.

It is settled law that a finding of guilty knowledge may not be avoided by a showing that the defendant simply closed his eyes to what was going on about him; "see no evil" is not a maxim in which the criminal defendant should take any comfort.

Guilty knowledge cannot be established by demonstrating mere negligence or even foolishness on the part of a defendant. However, it is not necessary, for instance, that the government prove to a certainty that Thomas Ciambrone knew that Joseph Riggio, for example, was directly threatening physical injury and violence in demanding that Apple stop doing business with Computer Sciences. You may find the defendant had such knowledge if he was aware of a high probability that it was so, unless he actually believed that no threats were being employed by Riggio.

Thus, if you find that the defendant you are considering acted with deliberate disregard of whether threats were used and with a conscious purpose to avoid learning the truth, the requirement of knowledge would be satisfied, unless the defendant actually believed that threats were not used.

Cir.1984), membership in a *conspiracy* cannot be proven by conscious avoidance, since the requisite mental state for conspiracy is intent. Conscious avoidance of participating in a conspiracy and agreeing to be a member of a conspiracy are mutually exclusive concepts. But the instructions here were given in accordance with Judge Carter's previous indication that he would "explain the charge of conspiracy after I have explained the other substantive counts in the indictment"; they were given only in respect to the substantive counts. The judge repeated after giving the conscious avoidance instruction that "I have just reviewed with you the elements of the substantive charges set forth in Counts Two through Seven. In a moment I will review with you the elements of the conspiracy charge set forth in Count One."

He then discussed in depth Count One, the conspiracy count, and clearly stated that "[t]he gist or essence of the offense is a combination or mutual agreement by two or more persons to disobey or disregard the law." He spelled out that the evidence on the conspiracy count must show beyond a reasonable doubt that "two or more persons in some way or manner positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan"; that the defendant "whom you are considering wilfully became a member of such conspiracy"; that "one of the conspirators during the existence of the conspiracy knowingly committed at least one of the means or methods or overt acts described in the indictment" and that such act was "knowingly committed" in an effort to accomplish some object or purpose of the conspiracy. He then essentially repeated these elements in more depth and made clear that in determining whether a given defendant was a member of an alleged conspiracy "the jury should consider only that evidence, if any, pertaining to his own acts and statements" and that a defendant is not responsible for the acts or declarations of other alleged participants until it is established beyond a reasonable doubt, first, that a conspiracy existed and, secondly, from the evidence of his own acts and statements that the defendant was one of its members. In standard language he charged that

> mere presence at the scene of an alleged transaction or mere similarity of conduct among various persons and the fact that they may have associated with each other and may have assembled together and discussed common aims and interests does not necessarily establish proof of the existence of a conspiracy.

He added: "Also, a person who has no knowledge of a conspiracy but who happens to act in a way which advances some object or purpose of a conspiracy does not thereby become a conspirator."

■ In short, the conscious avoidance charge was given only as to the substantive counts as to which the evidence warranted the giving of the charge. The charge thus guided the jury as it deliberated about those counts and considered Ciambrone's conversation with Miller and Riggio's testimony that, after Ciambrone's conversation with Miller, Ciambrone never contacted Riggio to find out what he had said to Miller or to determine whether Miller's allegation that he had been threatened was true. *See, e.g., United States v. McAllister,* 747 F.2d 1273, 1275 (9th Cir.1984) (upholding conscious avoidance charge), *cert. denied,* —— U.S. ——, 106 S.Ct. 92, 88 L.Ed.2d 76 (1985).

■ Appellant also claims juror taint. On the second day of deliberations, Juror Number Twelve informed the court that during those deliberations Juror Number Four had remarked that the defendants were "on the fringe of the Mafioso" or "part of the mob." With the consent of all counsel, the court promptly questioned Juror Number Four, who declared that she was "absolutely ... not" concentrating on the defendants' ethnic background instead of on the issues. She said that she had instead been thinking of the evidence which indicated that the defendants had "connections with other ... elements ... in society." When she had expressed her thought in the jury room, Juror Number Twelve

had asserted that as an Italian she took Juror Number Four's remarks as a personal insult. The trial judge, after interviewing the jurors involved and satisfying himself that there was not enough in the record to warrant discharging either of them, at the suggestion of counsel recalled the jury and told it that there was

> nothing about the Mafia, about the Mafioso, there is nothing whatever to interfere with your deliberations.
>
> The fact that they are Italian has nothing to do with anything in your deliberations....
>
> This case can't be based upon ethnic values.... And the evidence that was introduced, the statements of Mr. Riggio that the Ciambro[n]es had friends in New York, was admitted for your consideration as to whether or not it constituted a threat. It was not admitted for any other purpose and it is only to be utilized by you for the purpose for which it was received, that is, whether you feel that that statement constituted a threat.

On the assumption that this point has been preserved in the absence of an explicit request for the discharge of a juror or the failure to seek a mistrial, there is no probability of prejudice either on the part of one juror or the jury as a whole. Judge Carter properly exercised his discretion: by closely questioning the allegedly biased juror and by giving the jury clarifying instructions, he ensured that the verdict would not be tainted. *See United States v. Read*, 658 F.2d 1225, 1241–42 (7th Cir.1981).

■ Ciambrone's argument that the district court abused its discretion in denying his motion for a severance is unavailing. While the case against Ciambrone's brother was considerably stronger than the case against him, there is frequently a disparity in the proof offered against codefendants. *See United States v. Carson*, 702 F.2d at 366–67. As the different verdicts against the two men suggest, the jury was able to consider the case against Ciambrone without a significant spillover effect from the case against his brother. Moreover, this was not a case in which incompatible de-

fenses cast one defendant in the position of proving the case against the other. In short, Ciambrone has failed to show "substantial prejudice amounting to a miscarriage of justice," *United States v. Wilkinson*, 754 F.2d 1427, 1435 (2d Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985), and in the absence of such a showing his severance argument fails.

Judgment affirmed.