UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles H. KEHM, III, and Steven M. Greenberg, Defendants-Appellants.

Nos. 84–3028, 85–2156.

United States Court of Appeals,
Seventh Circuit.

Argued May 7, 1986.

Decided Aug. 26, 1986.

---

See also 772 F.2d 340.

the cases have been concluded. See *United States v. Markowski*, 772 F.2d 358 (7th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1202, 89 L.Ed.2d 316 (1986); *United States v. Molt*, 772 F.2d 366 (7th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1458, 89 L.Ed.2d 715 (1986). Today we deal with two of the participants in Markowski's organization, Charles Kehm and Steven Greenberg. The evidence allowed the jury to find that Kehm managed a resort in the Bahamas where he helped other importers transship drugs and that he was the captain of a boat on which drugs were carried. Greenberg was a lawyer. The jury could have found that he organized Marlowe Corp., through which Markowski and his henchmen rented an airplane used to carry drugs, and that Greenberg also alerted members of the gang when they were too "hot" to visit the Bahamas. In separate trials, Kehm and Greenberg were convicted of conspiring to import and distribute marijuana and cocaine, in violation of 21 U.S.C. §§ 841, 846, 952(a), and 963. Kehm received consecutive terms adding to eight years' imprisonment; Greenberg was sentenced to concurrent terms of two years' imprisonment.

I

Kehm's principal argument concerns a videotape of a discussion with two undercover agents. During the discussion Kehm offered his services as a smuggler and told the agents he could hide the operation by using a resort as a cover. The tape also contains Kehm's boasts about his past crimes. The district court initially excluded this videotape, which concerns new crimes as well as the ones for which Kehm stood accused, on the ground that this other-crime evidence would unduly injure Kehm's defense. See Fed.R.Evid. 403. The court allowed agent Munson, one of the agents seen on the videotape, to testify to Kehm's admissions concerning the Markowski smuggling ring.

William T. Grimmer, Asst. U.S. Atty., Hammond, Ind., for defendants-appellants.

Gary B. Kromelow, Sinnott & Kromelow, Chicago, Ill., Rhoda A. Brofman, Davis, Brofman, Zipperman & Dirschenbaum, Atlanta, Ga., for plaintiff-appellee.

Before COFFEY and EASTERBROOK, Circuit Judges, and CAMPBELL, Senior District Judge.[*]

EASTERBROOK, Circuit Judge.

Ronald Markowski organized a smuggling ring to import drugs from South America via the Bahamas. Forty-one participants were indicted in Indiana. Most of

[*] The Honorable William J. Campbell, Senior District Judge for the Northern District of Illinois, is sitting by designation.

Kehm put on fourteen witnesses. Twelve testified that they had not seen Kehm smuggle anything. Many also testified that Kehm was busy running his bustling resort; counsel pressed the implication that Kehm would not have had time to smuggle anything. After this defense had been presented the prosecutor renewed his request to use the videotape, arguing that the tape showed a "plan" within the meaning of Fed.R.Evid. 404(b): Kehm's proposal on the tape, like the operation of which he was accused, involved the use of a resort as a cover for a smuggling operation. The district judge agreed and admitted the tape on rebuttal. Kehm now says that the tape does not show a plan within the meaning of Rule 404(b) and is unduly prejudicial and confusing under Rule 403.

■ No doubt the tape was prejudicial. Kehm brags about his role in earlier smuggling ventures, including this one. The boasts are admissions under Fed.R.Evid. 801(d)(2)(A). This is a permissible kind of prejudice. And there is another, undesirable kind. Kehm says that the tape shows him to be "a big-talking, high-rolling, profane drug smuggler. Nothing could have been more prejudicial". Yet the defendant's manner of speech could not be separated from the content of the conversation, which was itself admissible—not necessarily to show a "common plan" but because the tape as a whole was an "admission" within the meaning of Rule 801(d)(2)(A). The core of the defense was that Kehm was too busy running his resort to smuggle. The conversation with the agents, during which Kehm proposed to use a resort as a cover for smuggling, is an admission that an operator of the kind of resort Kehm ran in the Bahamas is *not* too busy to smuggle. That sort of admission may be used as evidence.

■ The prejudice remains, but the increase in prejudice comes from the fact that the videotape is vivid, not from the fact that it is slanted. The district court had to decide whether the prejudice was too much, and its decision is reviewed under a deferential standard. See *United States v. Bressler*, 772 F.2d 287 (7th Cir. 1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 852, 88 L.Ed.2d 892 (1986) (exclusion of videotape); *United States v. Weisz*, 718 F.2d 413 (D.C.Cir.1983), *cert. denied,* 465 U.S. 1027, 104 S.Ct. 1285, 79 L.Ed.2d 688 (1984) (admission of videotape). The court's decision here was reasonable. The evidence was highly probative and not unduly confusing.[1] It was used only in rebuttal, and then only because the scheme Kehm proposed to the agents on tape contradicted his defense at trial. Kehm's counsel did not suggest any way the videotape could be redacted to spare the jury the worst of the profanity and braggadocio. Kehm brought use of the tape on himself by presenting the defense he did.

## II

George Anthony (Tony) Hicks grew up in the Bahamas. A pilot for the smuggling ring, Hicks testified against both Kehm and Greenberg. The government promised Hicks that he would not be prosecuted, and he was placed in the witness protection program. As a protected witness, Hicks was paid a stipend and living allowance by the government. This and other information was disclosed to Kehm and Greenberg. At Kehm's trial, Hicks implied when answering one question that there was a further, undisclosed promise: that he would not be asked any questions tending to implicate Bahamians. Hicks said that he feared for the safety of his family, still living in the Bahamas, and that he did not

---

1. Kehm says there must have been confusion, because during deliberations the jury asked for the testimony on cross-examination of Agent Munson, which "pertains to Agent Munson's admitting he was smuggling in the Bahamas near Sampson Cay." Munson had not been smuggling near Sampson Cay, where Kehm's resort was located; the taped conversation referred to smuggling at Munson Cay. But the jury wanted the cross-examination, not the tape, and Munson the witness (as opposed to Munson the character in the videotaped drama) had relayed to the jury Kehm's boasts about smuggling at Sampson Cay. The question from the jury does not show hopeless confusion.

want to hurt his friends there. This revelation is the basis for two arguments. Kehm says that he was the victim of unconstitutionally selective prosecution, because only non-Bahamians were prosecuted. Greenberg says that the prosecutor violated the due process clause of the fifth amendment by withholding material information that would have undermined Hicks's credibility.

▮ Only one of the Bahamians who participated in this smuggling ring has been indicted, and the prosecutor does not plan to proceed against the one. The prosecutor filed an affidavit stating that this occurred because the case against each Bahamian would have depended on Hicks, who refused to testify voluntarily. The prosecutor continued: "[M]y decision not to recommend indicting Bahamians was not based on any promise made to George Anthony Hicks—because I made no such promise to him—but rather it was based on my professional evaluation of the facts and my experience as a prosecutor." Hicks confirmed that he had never been promised that no Bahamians would be prosecuted; he testified only that he had been promised that he would not be asked to inculpate Bahamians. So the prosecutor's position is: no voluntary evidence, low chance of conviction, no prosecution. This is a permissible choice. Cf. *Wayte v. United States*, 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985); *United States v. Kerley*, 787 F.2d 1147 (7th Cir.1986).[2] The category "all non-Bahamians, plus all Bahamians who can be convicted without the testimony of George Anthony Hicks"—the category the prosecutor will proceed against—is hardly a minority in need of protection from abusive prosecutorial choices. It does not violate the constitution to excuse from prosecution a group of criminals who share two features, a foreign nationality and a witness unwilling on that account to testify against them. We suppose a treaty could excuse Bahamians from prosecution in this country, but here it is enough that the unavailability of evidence accounts for the prosecutor's decision.

Greenberg's claim is that Hicks's unwillingness to testify could have been used effectively on cross-examination. The promise initially appears to be unlike promises of immunity, payment, and the other things the prosecutor must reveal under *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and cases in the line currently ending at *United States v. Bagley*, — U.S. —, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). But Greenberg insists that the promise is significant, because it could show that Hicks had a reason to point the finger at innocent people. He had to testify against some people to earn his immunity from prosecution. If he would not testify against Bahamians—out of fear or friendship—and if only or predominantly Bahamians were involved in the crimes, then maybe Hicks had to tell some tall tales to keep out of prison. Greenberg also observes that Hicks testified that he began to cooperate because his "conscience had been bothering him"; the revelation that his conscience didn't bother him much about Bahamian criminals might affect his credibility.

▮ Greenberg does not say that the prosecutor suborned perjury. Cf. *United States v. Kaufmann*, 783 F.2d 708 (7th Cir.1986). The failure to inform Greenberg stemmed from a belief that the promise is not pertinent. Although the information should have been provided to the defense, the omission requires a new trial only if the evidence is material under the standard of *Bagley*, 105 S.Ct. at 3384: "[The] evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." The district court reasonably con-

---

2. Kehm relies on, and the prosecutor distinguishes, *United States v. Schmucker*, 721 F.2d 1046 (6th Cir.1983), which Kehm maintains establishes that almost any selectivity is suspect.

Neither side noticed that *Schmucker* had been vacated by the Supreme Court in light of *Wayte*, 471 U.S. 1001, 105 S.Ct. 1860, 85 L.Ed.2d 155 (1985). Indeed neither side noticed *Wayte*.

cluded that the information is not material in this sense:

> The cross-examination of Hicks gave the jury a number of reasons to disbelieve Mr. Hicks if they so chose. Hicks admitted that he had been a professional drug smuggler, and a habitual and heavy user of cocaine. Defendant's counsel repeatedly examined Hicks on the personal benefits he received while being in the Witness Protection Program, including opportunity to upgrade his piloting skills. Hicks had two letters from [prosecutors] declining prosecution. Finally, defense counsel raised the believability of Hicks' testimony concerning his drug smuggling flights and personal contacts with defendant. In sum, the omission of a possible line of cross-examination regarding Bahamian prosecution does not place the witness in a false light. The impeachment value of the omitted evidence was minimal because of the other impeachment evidence presented to the jury.

Findings of this sort are reviewed with deference. The district judge can place the omitted information in perspective, because he had and we lack a view of the entire trial process. The judge gave a sound explanation why the omission of the evidence did not meet the standard of *Bagley,* and Greenberg has not established that the judge's appreciation was a clear mistake.

### III

Nigel Bowe, an attorney and citizen of the Bahamas, may have been one of the conspirators. In the Bahamas he has remained. The prosecutor left Bowe out of the indictment because at the time he thought there was no extradition treaty with the Bahamas, making an effort to prosecute Bowe futile. Greenberg wanted Bowe's testimony, believing it would be helpful. But preliminary discussions with Bowe were fruitless; he refused to come to the United States voluntarily, and the extradition treaty with the Bahamas (30 U.S.T. 187, T.I.A.S. 9185) is limited to extradition for trial or punishment. Greenberg therefore moved for leave to take Bowe's deposition in the Bahamas, representing that Bowe's unavailability as a witness established the "exceptional circumstances" that Fed.R.Crim.P. 15(a) requires.

The district court was not satisfied by the parties' joint representations that Bowe would be unavailable at trial. Recognizing how unusual a criminal deposition is, see *United States v. Mann,* 590 F.2d 361 (1st Cir.1978), the court insisted that an affidavit of unavailability be obtained. Bowe supplied the affidavit. He quoted portions of the indictment that charged several of the defendants with bribing Bahamian officials through the offices of an unnamed Bahamian attorney and concluded that he must have been the unnamed attorney, although his affidavit denied paying any bribes. Bowe then stated: "I will not voluntarily appear before the Federal Court ... in light of the fact, and that, from the tenure [sic] of the indictment ... I may be considered an unindicted co-conspirator and therefore subject to arrest for criminal charges in the United States, were I to appear." The judge took Bowe at his word and authorized the taking of a deposition in the Bahamas. The deposition was taken, with Greenberg present, by an attorney for Greenberg and one of the prosecutors.

Things did not turn out as Greenberg wished. He did not offer the deposition for use at the trial; the prosecutor did. Greenberg then executed a smart about-face and argued that Bowe was available for trial after all, making the deposition inadmissible under Fed.R.Evid. 804. The judge, choosing to believe Bowe's affidavit and his statements at the deposition that he would not go to the United States, allowed the deposition into evidence. After trial Greenberg procured a new affidavit, in which Bowe stated: "I was never unavailable to the government as a witness." The price for this "availability" presumably was immunity from prosecution, though the affidavit does not make this explicit. At all events, the district court ultimately denied Greenberg's motion for a new trial, holding that Bowe's first affidavit was honest and his second affidavit a fib.

Although Greenberg puts his argument on appeal as one under the confrontation clause of the sixth amendment, that clause does not forbid the use of recorded testimony if the declarant is unavailable for trial and the testimony was taken under circumstances that make it reliable. *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Cf. *United States v. Inadi*, —— U.S. ——, 106 S.Ct. 1121, 1125–26, 89 L.Ed.2d 390 (1986). Because counsel for both sides, and the defendant personally, were present at Bowe's deposition, and everyone, expecting the deposition to be used (on Greenberg's behalf) at trial, had the incentive to develop the testimony fully, the deposition meets the constitutional standards of reliability. This leaves only the requirement of the declarant's unavailability, which appears in Fed.R.Evid. 804(a) and Fed.R.Crim.P. 15(e). The unavailability doctrine under these rules is at least as stringent as the constitutional command, so this case may be decided under the rules alone.

Rule 804(a)(5) states that a person is unavailable if "absent from the hearing and the proponent of his statement has been unable to procure his attendance ... by process or other reasonable means." The prosecutor did not try to issue compulsory process to Bowe; indeed the prosecutor did not try *any* means, "reasonable" or otherwise, to secure Bowe's attendance at trial. Greenberg insists that the prosecutor's inaction precludes a finding of unavailability. The prosecutor replies that a request would have been futile, to which Greenberg responds that the United States could have extradited Bowe as an "unindicted co-conspirator" or in a pinch could have indicted Bowe and extradited him as a fugitive from justice.

Futility excuses a request. Neither Rule 804(a)(5) nor the constitution requires the prosecutor to butt his head against a wall just to see how much it hurts. But futility is a matter of degree. Maybe the prosecutor could have prevailed on the President to negotiate a new treaty. There is almost always some avenue to be pursued, albeit with minuscule chance of success. So the question is not one of absolutes, it is one of degrees, and a favorable outcome need not be certain to make it necessary to act. The advisory committee's note to Rule 804(a)(5) refers to *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968), as the standard for the reasonableness of efforts to obtain non-resident witnesses, and *Barber* holds that a prosecutor may not omit making a request just because the answer is not a sure thing.

The declarant in *Barber* was in federal prison in Texas; a state prosecutor in Oklahoma did not request the federal government to make him available for trial, stating that the federal government had discretion not to comply with such a request. Although the federal government would have had discretion to say no, it was the "policy" of federal officials to "permit federal prisoners to testify in state court criminal proceedings pursuant to writs of habeas corpus *ad testificandum* issued out of state courts." 390 U.S. at 724, 88 S.Ct. at 1321 (note omitted). The policy was not invariant, but " 'the possibility of a refusal is not the equivalent of asking and receiving a rebuff.' In short, a witness is not 'unavailable' ... unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial. The State made no such effort here, and, so far as the record reveals, the sole reason why [the declarant] was not present to testify in person was because the State did not attempt to seek his presence." 390 U.S. at 724–25, 88 S.Ct. at 1321–22 (citation omitted). *Barber* dealt with a declarant in the United States, but there is no reason why the principle stops at the border. See *United States v. Sindona*, 636 F.2d 792, 804 (2d Cir.1980), *cert. denied*, 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981) (by implication).

The favorable response need not be certain; *Barber* establishes this. Need it be more likely than not that the response would be favorable? Is a 10% chance of a favorable outcome enough to require the prosecutor to try? Both the constitution

and Rule 804 strongly favor live testimony, and it is always easy to ask politely. Because the cost of the request is low and the benefit of a favorable response high, it is necessary to ask even when the answer is likely to be no. Nothing ventured nothing gained. Here, however, the probability of a favorable response under current law was low, and the probability that Bowe would testify at all if haled into this country was low as well; the combined probability was close to zero. Even a small expenditure of time by prosecutor and Department of State is unnecessary when the joint probability is so low.

▪ First things first. The chance Bowe could have been brought to the United States as a witness was vanishingly small. The only treaty in question, which covers extradition, does not authorize compulsory process to produce witnesses. A polite request to turn Bowe over would have been an insult to Bahamian officials. No civilized country will turn over one of its nationals to a foreign power, against the person's will, in the absence of a treaty. The State Department was unlikely to request the Bahamas to send a team of goons to Bowe's house to spirit him out of the country in the dead of night. Nothing short of a new treaty could have produced Bowe's involuntary appearance in the United States as a witness. The existing treaty with the Bahamas [3] allows extradition only of a person who has been "accused or convicted" of one of the listed offenses. Art. 1, 47 Stat. 2122. Article 9 of the treaty says that there shall be extradition "only if the evidence be found sufficient", 47 Stat. 2125, to justify a trial. The treaty does not refer to "unindicted co-conspirators", let alone to co-conspirators who are unnamed. The only way the United States could have secured Bowe's presence under the treaty, then, would have been to have indicted him and convinced authorities in the Bahamas that the evidence was sufficient.

Suppose that had been done. Would Bowe then have been available to be a witness at trial? This is most unlikely, because Bowe would have possessed a privilege not to incriminate himself. A testimonial privilege is an independent ground of "unavailability". Fed.R.Evid. 804(a)(1). The government could have overridden the privilege by granting Bowe testimonial immunity, but the government need not grant immunity to produce testimony. *United States v. Lang*, 589 F.2d 92, 96 (2d Cir. 1978); *United States v. Ramsey*, 503 F.2d 524, 532–33 (7th Cir.1974), *cert. denied*, 420 U.S. 932, 95 S.Ct. 1136, 43 L.Ed.2d 405 (1975). Testimonial immunity is the only one at issue. Transactional immunity would have made Bowe a voluble witness but would have spoiled the ground of his extradition from the Bahamas. When Bowe said that he had never been unavailable as a witness for the government, he must have meant a witness with transactional immunity; Bowe was quite unwilling to expose himself to criminal prosecution. So Bowe's condition for testimony was out of the question, a less sweeping immunity was unnecessary, and without either kind of immunity Bowe would have been "unavailable" whether physically in the United States or the Bahamas.

So a request in this case was exceptionally unlikely to make Bowe available as a witness. Rule 804 does not require pointless gestures. *United States v. Losada*, 674 F.2d 167, 172 (2d Cir.1981), *cert. denied*, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982); cf. *United States v. Squella-Avendano*, 478 F.2d 433, 439 (5th Cir.1973). Once Bowe swore that he would neither appear nor testify voluntarily, the prosecutor was stymied. Greenberg therefore was right when he requested permission to take the deposition: Bowe is "unavailable" as a witness, and the deposition was admissible at trial.

**3.** The United States and the Bahamas adopted in 1978 the Extradition Treaty between the United States and the United Kingdom that entered into force in 1932. 47 Stat. 2122. No one seems to have noticed that by 1978 the 1932 treaty had been superseded. However that may be, the text of the 1932 treaty with the United Kingdom is now the 1978 treaty with the Bahamas.

362

## IV

Greenberg believes that several of the instructions to the jury were defective. The only one to which an objection was preserved is an "ostrich" instruction telling the jury, as part of the definition of "knowingly", that "[n]o person can intentionally avoid knowledge by closing his eyes to facts which should prompt him to investigate." This instruction has been held sufficient in many cases, most recently *United States v. Ramsey*, 785 F.2d 184, 188–91 (7th Cir.1986). We have urged district judges to choose better language, but we have also held that this language is permissible.

At trial Greenberg objected to the language of the ostrich instruction. At oral argument on appeal Greenberg added an objection to the giving of any ostrich instruction, on the ground that ostrich instructions should never be given in conspiracy cases. The argument comes too late, and it is a bad argument anyway. One court of appeals has held that ostrich instructions should not be used in conspiracy cases. *United States v. Mankani*, 738 F.2d 538, 547 & n. 1 (2d Cir.1984). See also *United States v. Ciambrone*, 787 F.2d 799, 809–10 (2d Cir.1986) (distinguishing *Mankani*). The Second Circuit has held that "membership in a *conspiracy* cannot be proven by conscious avoidance, since the requisite mental state for the conspiracy is intent. Conscious avoidance of participating in a conspiracy and agreeing to be a member of a conspiracy are mutually exclusive concepts." *Ciambrone*, 787 F.2d at 810 (emphasis in original). Put in this way, the point is unexceptionable; one cannot be a conspirator yet consciously avoid being a conspirator. To avoid being a conspirator is to be innocent of conspiracy. But this is not how an ostrich instruction is used in conspiracy cases.

Often the defendant will say that he agreed with someone else to do something but did not know the scope of the agreement. Here, for example, Greenberg conceded that he set up Marlowe Corp. for Markowski and friends, that he arranged to rent the airplane through Marlowe, and that the directors of Marlowe all used pseudonyms, but he maintained that he did not know the names were fictitious or that the plane would be used for smuggling and thus did not conspire to import drugs. If Greenberg knew, he is a conspirator; if he did not know, he is a dupe and must be set free. The facts suggest a high probability of awareness, and Hicks testified that Greenberg even left one meeting, when the use of the plane came up, with the remark that he didn't want to hear about it. This is exactly the sort of situation for which an ostrich instruction is designed. As we explained in *Ramsey*, awareness of a high probability of something, coupled with avoidance of further knowledge for fear of what you will learn, is the sort of "knowledge" to which the law refers. When knowledge is disputed, an ostrich instruction may help the jury understand that legal knowledge of something is not necessarily the same as a conscious awareness of a certainty of that thing. We have sustained conspiracy convictions in cases in which ostrich instructions were given, e.g., *United States v. Petullo*, 709 F.2d 1178 (7th Cir.1983); *United States v. Lynch*, 699 F.2d 839 (7th Cir.1982), and we hold that in a conspiracy prosecution it is permissible to give an ostrich instruction as part of the definition of knowledge or knowingly. Accord, *United States v. Lanza*, 790 F.2d 1015, 1021–23 (2d Cir.1986).

None of the remaining challenges to the instructions was preserved. Both the prosecutor and counsel for Greenberg gave the judge a full set of instructions. The judge informed both sides that he would write his own. At the conference on instructions, counsel for Greenberg made a few particular objections (such as the one to the ostrich instruction) and then requested the court in general terms to give the defendant's proposed instructions rather than the court's set. This request does not preserve an objection. The party must "state[ ] distinctly the matter to which he objects and the grounds of his objection." Fed.R.Crim.P. 30. The objection must

point to something particular in the instruction and identify what, particularly, is wrong, and why; nothing else alerts the judge to what is at stake. The function of the objection is to avoid avoidable mistakes at trial. A plea to "give *my* instruction" does not identify either the language at stake or the reasons why it is mistaken, and therefore it is useless. See *Markowski*, 772 F.2d at 362–63. This leaves only the possibility that an instruction was "plain error" under Fed.R.Crim.P. 52(b), which means not only palpably wrong but also likely to cause the outcome of the trial to be mistaken.

■ The sorts of things Greenberg contests are not plain error; they probably were not error of any sort. For example, the judge gave Instruction 5.11 of this circuit's pattern jury instructions, which states the elements of the offense of conspiracy, but instead of asking the jury to determine whether "the alleged conspiracy existed" he asked the jury to determine whether "the conspiracy existed". It is not a good idea to excise words from the pattern jury instructions, even if the district judge believes them redundant—as the district judge thought "alleged" redundant here, given that the purpose of the instruction was to ask the jury to decide whether the conspiracy "existed". These instructions have been gone over with care, and adhering to them—when they are not misleading in the particular case—will avoid creating unnecessary issues. Greenberg says that omission of "alleged" could lead the jury to think it was entitled to convict Greenberg of a conspiracy other than the two charged, perhaps a conspiracy to hide the true identities of the directors of Marlowe.[4] That so subtle an omission would have this startling effect is implausible; the district court repeatedly told the jury that its function was to determine whether Greenberg was guilty of conspiring to violate the drug laws.

■ Greenberg has three more plaints. He wanted and did not get an instruction that "mere association" with criminals is not a crime, "mere presence" not conspiracy. This is a good instruction, but its omission is not plain error when the jury has been told, as this was, that the defendant must "intentionally and knowingly" join the conspiracy, and these terms were defined in a way that informs the jury that much more than presence or association is necessary. The district judge also omitted a detailed definition of "willfully". The instruction—which both prosecutor and defense counsel requested—should have been given. See *Markowski*, 772 F.2d at 365 n. 3. But nothing turned on the fine points of wilfulness, so the omission was not plain error. Finally there was a quirk in the instructions on the mental element of the offense. The court told the jury that it could return a verdict of guilty only if Greenberg "knowingly and intentionally became a member of the conspiracy", but it did not define with equal clarity the knowledge component of the underlying offense. It is always enough if a conspirator has the same mental state as the underlying crime requires, *United States v. Feola*, 420 U.S. 671, 692, 95 S.Ct. 1255, 1267, 43 L.Ed.2d 541 (1975) (dictum). When less will do is a difficult question. We need not pursue the nicer points of knowledge and intent, however, because there was no dispute at trial that *someone* in the Markowski organization intended to import drugs; the defense was that Greenberg didn't join the Markowski smuggling ring and acted only as a lawyer, unaware of the nature of the gang whose corporation he oversaw. The charge that required the jury to find that Greenberg "knowingly and intentionally" signed up with the team was sufficient. This court has never required a laborious definition of intent, and the simple instruction the district judge gave withstands an attack based on the plain error doctrine.

AFFIRMED.

4. A somewhat different claim was made at trial and preserved for appeal: that a separate instruction should have focused the jury's attention on drug conspiracies versus all possible non-drug conspiracies. This claim was not pursued on appeal, however, and would have fared no better than the one based on the omission of "alleged".